# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**ESTATE OF OTIS OWEN FOX, et al.**,

Plaintiffs,

vs.                                               No. CIV 04-1214 MCA/WDS

**DON BURDINE, et al.**,

Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Defendants' *Motion for Summary Judgment (Qualified Immunity)* [Doc. 24], filed November 18, 2005. Having considered the parties' submissions, the relevant law, and otherwise being fully advised in the premises, the Court grants the motion in part and defers the motion in part.

On October 24, 2001, Otis Owen Fox was pronounced dead in his cell at the Roosevelt County Detention Center ("RCDC").

Fox's sisters, Cloreta Joyce Hawk and Maurcenia Cross, co-personal representatives of Fox's estate ("the Estate") now bring this 42 U.S.C. § 1983 action against various Defendants. The Estate contends that Defendants' intentional indifference to Fox's need for medical attention was the actual and proximate cause of his death. More specifically, the Estate alleges that Defendants' (1) failure to respond to Fox's "many" complaints of chest pain, (2) decision to prevent inmates Ernest Griffin and Joseph Carpenter from continuing to administer CPR without providing substitute CPR, and (3) failure to seek immediate

emergency assistance for Fox constituted a deliberate indifference to Fox's life, safety, and well-being, in violation of the Eighth and Fourteenth Amendments to the United States Constitution. [Doc. 1 at 2, 4]. Defendants have moved for summary judgment on the ground that they are entitled to qualified immunity. [See generally Doc. 24].

## I. BACKGROUND

The following facts are taken from the *Complaint for Damages Pursuant to 42 U.S.C. § 1983* [Doc. 1], filed October 22, 2004, or are undisputed by the parties and, thus, are accepted as true for purposes of Defendants' summary-judgment motion.

On July 14, 2001, Fox was arrested for driving while intoxicated and subsequently booked into the RCDC. [Doc. 24 at 4]. When he was processed into the RCDC in the early morning hours of July 15 2001, Fox advised the booking officer that, among other things, he was not taking any medications and had no heart problems. The booking officer completed a *Medical Page* reflecting Fox's representations, and Fox signed it. It is undisputed that prior to his incarceration at the RCDC, Fox had not been treated for any heart-related illness or condition. [Id.].

As of October 24, 2001, Fox was still a pretrial detainee at the RCDC. On that date, on-duty personnel at the RCDC included Defendants Don Burdine, Director of the RCDC; Annette Duarte, RCDC Corrections Officer; and Victor Ramsey, RCDC Transport Officer.[1]

---

[1] The remaining Defendants in this action are Constance Belcher, RCDC Nurse Practitioner; C.D. Newberry Jr., Sheriff of Roosevelt County; John or Jane Doe Numbers One to Ten; County of Roosevelt; and the Roosevelt County Detention Center. [See Doc. 4, *Entry of Appearance*].

Also on duty that day were Sergeant Tino Montoya and Detention Officers Shawn Burrow and Mandy Queener. [Doc. 24 at 7].[2] Defendant Duarte was the officer in charge. [Id.].

At 10:30 a.m. October 24, 2001, Fox met with his attorney. After his appointment, Fox was escorted back to his cell by Officer Burrow. At that time, Fox asked whether Burrow could get him some "little white pills." For the past few days, Fox had been complaining to Burrow about indigestion, heartburn and chest pain. [Id. at 8]. Indeed, one day earlier, Fox had gone to see Defendant Belcher, RCDC Nurse Practitioner. [See Doc. 30 at 8, ¶ 7]. Burrow told Fox that he would check to see if the requested pills were approved and, if so, would arrange to get them for Fox. [Doc. 24 at 8].

At some point after the lunch trays were distributed in the late morning of October 24, 2001, Duarte, Montoya, and Queener heard a commotion and yelling from Dayroom 2, where Fox's cell was located. Duarte started walking toward Dayroom 2, but began running when the yelling intensified. Queener joined Duarte. Duarte and Queener were the first to enter Fox's cell, at which point they heard inmate Ernest Griffin yell, "We got a man down!" [Doc. 24 at 9]. When Montoya reached Fox's cell, he overheard one of the inmates exclaim, "We couldn't wake him up!" [Id.]. Fox was lying prone and motionless on his bed. His eyes were open but rolled upward, he was not breathing, and he appeared purplish in color. [Id. at 9-10]. Ernest Griffin and another inmate, Joseph Carpenter, were attempting to administer cardiopulmonary resuscitation ("CPR") to Fox. The officers who had by that time gathered

---

[2] Montoya, Burrow, and Queener apparently have been sued as John and Jane Does. [See Doc. 1 at 1].

in Fox's cell,  Duarte, Queener, Montoya, Burrow, and Ramsey, observed a clear, foamy liquid spewing from Fox's mouth each time Griffin pushed on Fox's abdominal area.  At 11:41 a.m., 911 was called.  [Id.].  An ambulance crew arrived at the RCDC at 11:46 a.m. [Id. at 9].

As the ambulance crew was arriving, Dayroom 2 was cleared and the inmates were locked in their cells.  [Doc. 24 at 11].  Having been locked in their cells, Griffin and Carpenter necessarily stopped administering CPR to Fox.  [See Doc. 1 at 4].  As Dayroom 2 was cleared, Duarte, Montoya, and Ramsey each unsuccessfully attempted to find a pulse on Fox.  [Doc. 24 at 11].  At that time, Fox's body was cold to the touch.  [Id.].  After the inmates were locked in their cells, Queener met the ambulance crew and escorted them back to Dayroom 2.  The four-man paramedic crew found Fox lying on his bed as the officers had found him.  The paramedics observed Fox to be pulseless, unconscious, not breathing, and unresponsive.  Fox also was cyanotic (bluish or purplish) in appearance and was in full cardiac arrest.  The paramedics used "full code" procedures, including CPR, in an unsuccessful attempt to revive Fox.  They continued their efforts until 12:20 p.m., at which point they discontinued "code," Fox's condition having never changed.  [Id. at 11-12].

## II. ANALYSIS

### A. Standard of Review —  Summary Judgment

Summary judgment under Fed.R.Civ.P. 56(c) "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the

moving party is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c).  "When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading. . . ."  Fed.R.Civ.P. 56(e).  Rather, "the adverse party's response . . . must set forth specific facts showing that there is a genuine issue for trial."  Id.  Judgment is appropriate "as a matter of law" if the nonmoving party has failed to make an adequate showing on an essential element of its case, as to which it has the burden of proof at trial.  See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Lopez v. LeMaster, 172 F.3d 756, 759 (10th Cir. 1999).

In order to warrant consideration by the Court, the factual materials accompanying a motion for summary judgment must be admissible or usable at trial (although they do not necessarily need to be presented in a form admissible at trial).  See Celotex, 477 U.S. at 324.  It is not the Court's role, however, to weigh the evidence, assess the credibility of witnesses, or make factual findings in ruling on a motion for summary judgment.  Rather, the Court assumes the evidence of the non-moving party to be true, resolves all doubts against the moving party, construes all evidence in the light most favorable to the non-moving party, and draws all reasonable inferences in the non-moving party's favor.  See Hunt v. Cromartie, 526 U.S. 541, 551-52 (1999).

### B. Qualified Immunity and the Individual Defendants

Analysis of a motion for summary judgment based on qualified immunity, however, proceeds somewhat differently from other summary-judgment analyses because of the purposes behind qualified immunity.  Olsen v. Layton Hills Mall, 312 F.3d 1304, 1311 (10th

Cir. 2002).  Where, as here, the defendants invoke qualified  immunity, the plaintiff must

demonstrate that the defendants' actions violated a specific constitutional or statutory right.

If the plaintiff fails to meet its burden on this threshold inquiry, the qualified immunity

analysis comes to an end.  If the plaintiff meets this initial burden, the plaintiff must then

show that the constitutional right was "clearly established" prior to the challenged official

action.  Mata v. Saiz, 427 F.3d 745, 749 (10th Cir. 2005). If the plaintiff demonstrates the

violation of a clearly established constitutional or statutory right, the burden shifts back to

the defendants to prove that no genuine issues of material fact exist and that they are entitled

to judgment as a matter of law. In the end, therefore, the defendants still bear the normal

summary-judgment burden of showing that no material facts remain in dispute that would

defeat the qualified  immunity defense.  Olsen, 312 F.3d at 1312.

### C. 42 U.S.C. § 1983

Section 1983 of Title 42 of the United States Code provides, in relevant part, that

> [e]very person who, under color of any statute, ordinance,
> regulation, custom, or usage, of any State or Territory or the
> District of Columbia, subjects, or causes to be subjected, any
> citizen of the United States or other person within the
> jurisdiction thereof to the deprivation of any rights, privileges,
> or immunities secured by the Constitution and laws, shall be
> liable to the party injured in an action at law, suit in equity, or
> other proper proceeding for redress.

42 U.S.C. § 1983.  Section 1983 is not an independent source of substantive rights; rather

it is a mechanism for enforcing federal rights conferred elsewhere.  See Albright v. Oliver,

510 U.S. 266, 271 (1994).  Accordingly, an analysis of a plaintiff's federal civil-rights claim

6

necessarily begins by identifying the specific constitutional right or rights allegedly infringed.  Graham v. Connor, 490 U.S. 386, 393-94 (1989).

In this case, the Estate contends that Defendants exhibited a "deliberate indifference to the life, safety and well being" of Fox by (1) ignoring Fox's "many" complaints of chest pain, (2) preventing Griffin and Carpenter from continuing to administer CPR without providing a substitute form of CPR, and (3) failing to seek immediate emergency assistance for Fox, all of which worked a violation of Fox's rights under the Eighth and Fourteenth Amendments.  [Doc. 1 at 2, 4].

### D. The Eighth Amendment

A plaintiff states a cognizable Eighth Amendment claim for denial of medical attention if he "allege[s] acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." Olsen, 312 F.3d at 1315 (*quoting* Estelle v. Gamble, 429 U.S. 97, 106 (1976)).  The right to custodial medical care is clearly established.  Estelle, 429 U.S. at 104.  While pretrial detainees are protected under the Due Process Clause rather than the Eighth Amendment, the Tenth Circuit applies an analysis identical to that applied in Eighth Amendment cases brought pursuant to § 1983.  Olsen, 312 F.3d at 1315 (*quoting* Lopez v. LeMaster, 172 F.3d 756, 759 n.2 (10th Cir.1999)).  In this case, it is not contested that at the time of his death, Fox was a pretrial detainee.  [See Doc. 1 at 2; Doc. 24 at 1].

The test for constitutional liability—"deliberate indifference"—involves both objective and subjective components.  Mata, 427 F.3d at 751.  To satisfy the *objective* component, the prisoner or, in this case, the § 1983 plaintiff, must produce objective

7

evidence that the deprivation at issue was in fact "sufficiently serious."  The Tenth Circuit has stated that a medical need is sufficiently serious if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.  Id. (internal quotations omitted). Where, however, the necessity for treatment would not be obvious to a lay person, "the medical judgment of the physician, even if grossly negligent, is not subject to second-guessing in the guise of an Eighth Amendment claim."  Id.  Additionally, a delay in medical care constitutes an Eighth Amendment violation only where the plaintiff can show that the delay resulted in substantial harm.  Sealock v. Colorado, 218 F.3d 1205, 1210 (10th Cir. 2000).

The *subjective* prong of the "deliberate indifference" test requires the plaintiff to present evidence of the prison official's culpable state of mind.  Mata, 427 F.3d at 751.  The subjective element is satisfied if "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  Farmer v. Brennan, 511 U.S. 825, 837 (1994).  To be sure, the "deliberate indifference" standard lies "somewhere between the poles of negligence at one end and purpose or knowledge at the other."  Mata, 427 F.3d at 752 (*quoting* Farmer, 511 U.S. at 836); see also Smith v. Cummings, 2006 WL 1067305, at *2 (10th Cir. Apr. 24, 2006) (in Eighth Amendment prison-assault action, equating deliberate indifference to recklessness).  To find deliberate indifference does not require a finding of express intent to harm, and the plaintiff

need not show that a prison official acted or failed to act believing that harm actually would befall an inmate.  Rather, it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm.  <u>Mata</u>, 427 F.3d at 752.  Whether the prison official had the requisite knowledge of such a substantial risk is a fact question subject to demonstration in ways including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.  <u>Oxendine v. Kaplan</u>, 241 F.3d 1272, 1276 (10th Cir. 2001) (internal quotation omitted).

### 1. The Objective Component of the "Deliberate Indifference" Test

The first step in the analysis of the objective component of the "deliberate indifference" test is to identify the harm claimed by the plaintiff.  <u>See</u> <u>Mata</u>, 427 F.3d at 753.  "Once the [plaintiff] selects the harm, however, the focus of the objective prong should be solely on whether that harm is sufficiently serious."  <u>Id</u>.  In the instant case, the *Complaint* alleges, in pertinent part, that

> 8.  During the course of his incarceration at RCDC, OTIS OWEN FOX suffered from a debilitating heart condition and made *many complaints regarding chest pains*.  Defendants acted with deliberate indifference to OTIS OWEN FOX's need for medical attention.  OTIS OWEN FOX died as an actual and proximate result of the deliberate indifference of the defendants as to his medical condition and medical needs.

> 14.  On or about October 24, 2001, OTIS OWEN FOX, while confined at the RCDC suffered a heart attack or heart condition.  *He likely would have lived if CPR was administered promptly.* Two inmates at the RCDC knew CPR and offered to perform CPR.  *The supervisors at the RCDC (including defendant*

9

> *DUARTE) told the inmates that they could not perform CPR but
> did not provide any substitute for the CPR.  FOX died due to the
> failure to receive CPR.*  The removal of available CPR without
> providing substitute CPR constituted deliberate indifference to
> the life, safety and well being of OTIS OWEN FOX.

> 15. *Defendants failed to immediately seek emergency assistance*
> for OTIS OWEN FOX  and this deliberate indifference caused
> the death of OTIS OWEN FOX.

[Doc. 1 at 2-4 (emphasis added)].  In light of these allegations, particularly the emphasized

sections, the Court identifies the claimed harm as (1) Fox's complaints of chest pain and the

failure of Defendants to respond appropriately, and (2) Defendants' failure to cause or allow

CPR or other form of resuscitation to be administered to Fox in a timely manner; in other

words, Defendants' delay in providing medical care to Fox.  Both severe chest pain and a

delay in medical care (so long as the plaintiff shows that the delay resulted in substantial

harm) have been deemed sufficiently serious to satisfy the objective component of the

"deliberate indifference" test.  See Mata, 427 F.3d at 753 (plaintiff's severe chest pain

sufficiently serious to satisfy objective prong) and Sealock, 218 F.3d at 1210 (pain and

suffering resulting from prison officials' delay in providing medical care amounted to

condition sufficiently serious to meet objective element of "deliberate indifference" test).

Thus, the Court now turns to the issue of whether the Estate has satisfied the subjective

component of the "deliberate indifference" test.

### 2. The Subjective Component of the "Deliberate Indifference" Test

In order for the Estate to satisfy the subjective component of the "deliberate

indifference" test, it must show that Defendants knew of and disregarded an excessive risk

to inmate health or safety, meaning that Defendants must both have been aware of facts from which the inference could be drawn that a substantial risk of serious harm existed and they must also have drawn the inference.  Mata, 427 F.3d at 751.  The Estate must additionally establish that Defendants knew that Fox faced a substantial risk of harm and disregarded that risk by failing to take reasonable measures to abate it.  See Hunt v. Uphoff, 199 F.3d 1220, 1224 (10th Cir. 1999).

With respect to Fox's "many complaints" of chest pain, [see Doc. 1 at 2, ¶ 8], the Court concludes that the Estate has not met its burden of showing that Defendants knew of and disregarded any excessive risk posed to Fox by such pain.  As an initial matter, it is undisputed that upon being processed into the RCDC in the early morning hours of July 15, 2001, Fox was asked a number of health-related questions, including "Do you have a present medical problem?" "Does detainee currently take medication?" and "Does detainee have any heart problem?" all of which Fox answered in the negative.  [Doc. 25; Exh. A-1, "Arrest & Booking Medical Page"].  Additionally, prior to his incarceration at the RCDC between July and October 2001, Fox had not received medical treatment for any heart-related illness, infirmity, or condition. [Id.; Exh. C, "Interrogatory No. 4"].

The record evidence also discloses that, while Fox met with Defendant Belcher, RCDC Nurse Practitioner, the day before his death, his chief complaint was, "I think I have the flu." [Doc. 25; Exh. D-1, "Roosevelt County Detention Center Patient Assessment"].  Defendant Belcher recorded Fox's vital signs and noted "Past history unremarkable. *Denies cardiac*, hypertension."  [Id. (emphasis added)].  Defendant Belcher also noted that, in

general, Fox looked good, but that he had a productive cough, a fever, and was wheezing. Defendant Belcher diagnosed bronchitis, prescribed Erythromycin (an antibiotic) and Duratuss (cough medicine), and recommended a follow-up appointment the next week. [Id.]. Additionally, in her sworn affidavit, Defendant Belcher stated that Fox exhibited no signs of heart problems, nor did he complaint of chest, arm, or leg pain, or numbness in his fingers. While the Estate denies these facts, [see Doc. 30 at 4, ¶¶ 10, 11], such a general denial, without more, is insufficient to create a genuine issue of material fact on this point. See Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading. . . ."). [3]

---

[3] Nor has the Estate, through either its general denials or the affidavit of its attorney, August J. Rane, shown how the limited discovery it requests will enable it to rebut Defendants' allegations of no genuine issue of fact as to Fox's alleged complaints of chest pain. See Jones v. City and County of Denver, Colo., 854 F.2d 1206, 1211 (10th Cir. 1988). The Estate, in requesting limited discovery, asserts that "particularly necessary" to a full response to the summary-judgment motion are the depositions of Belcher, Duarte, Queener, Montoya, and Ramsey, as well as those of a number of other individuals whose testimony the Estate maintains is "also necessary to a fair determination of the factual issues in dispute."  [Doc. 30 at 3; see also Doc. 31; Exh. 1, "Affidavit of Attorney August J. Rane"].  While Rule 56(f) allows this Court to defer its ruling on a summary-judgment motion and call for additional discovery when affidavits of the party opposing the motion indicate that "the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition," Fed.R.Civ.P. 56(f), the Court notes that its discretion in this area is limited in situations where (1) the party opposing summary judgment asserts that evidence supporting its allegations is in the movant's hands, (2) discovery would not meet the issue on which the movant contends there is no genuine factual issue, and (3) the summary-judgment motion is based on qualified immunity.  See Jones, 854 F.2d at 1211.  In this case, the Court declines to exercise its Rule 56(f) discretion on the ground that the Estate has not demonstrated how the information it seeks would undercut the showing made by Defendants that they did not exhibit deliberate indifference to Fox's alleged chest pain.  See id.; see also Trask v. Franco, 2006 WL 1075595, at *3-*4 (10th Cir. Apr. 25, 2006) (affirming district court's refusal to allow discovery where, among other things, plaintiffs' Rule 56(f) affidavit failed to state with specificity how the additional material they requested would rebut defendants' summary-judgment

At most, the record evidence discloses that for the few days preceding his death, Fox had complained to Officer Burrow about indigestion, heartburn, and chest pains and, on the morning of his death, had asked Burrow for "little white pills," which Burrow understood to be over-the-counter pills for heartburn.  [Doc. 25; Exh. H, "Affidavit of Shawn Burrow," at 2].  Critically, however, it is undisputed that Burrow told Fox that he would check to see if such medication was approved and, if it was, arrange to secure the pills for Fox.  [Doc. 24 at 8, ¶ 20; Doc. 30 at 5, ¶ 20].  The Estate cannot satisfy the subjective component of the "deliberate indifference" test absent a showing that Burrow acted recklessly by consciously disregarding a substantial risk of serious harm.  See Farmer, 511 U.S. at 839; accord Mata, 427 F.3d at 752.  In this case, the record evidence does not support a conclusion that Burrow, who offered to check and see if the pills requested by Fox were approved and, if so, then to provide Fox with them, acted with a conscious disregard of a substantial risk of serious harm to Fox.  Moreover, as noted above, Fox was seen by Nurse Practitioner Belcher the day prior to his death, at which time Fox made no mention of chest pains and, in fact, "denie[d] cardiac."  [Doc. 25; Exh. D-1].  Because the Estate has failed to demonstrate Defendants' deliberate indifference with respect to Fox's alleged complaints of chest pain, summary judgment will be entered for Defendants on this point.

---

motion).  Instead, the Court concludes that to allow limited discovery on the issue of Fox's alleged chest pain would subvert the purposes of the qualified immunity defense, which include protection from "unnecessary and burdensome" discovery.  See Crawford-El v. Britton, 523 U.S. 574, 597-598 (1998).  As explained more fully in the body of this Opinion, however, the Court reaches a different conclusion with respect to the propriety of very limited discovery on the issue of Defendants' alleged delay in the provision of medical care on the day Fox died.

By contrast, the Court cannot say as a matter of law that Defendants did not exhibit a deliberate indifference to Fox's needs by delaying the provision of medical care once Fox was found unconscious in his cell on October 24, 2001.  See Mata, 427 F.3d at 755 ("A prisoner may satisfy the subjective component by showing that defendants' delay in providing medical treatment caused either unnecessary pain or a worsening of [his] condition.").  Moreover, the Court agrees with the Estate that *limited* discovery, the parameters of which are spelled out below, should be permitted on the issue of whether Defendants were deliberately indifferent to Fox's medical needs by delaying the provision of appropriate medical care.

The record evidence reveals that, on October 24, 2001, the day of Fox's death, Duarte and Queener were the first of the Defendants to reach Dayroom 2 in response to the noise and commotion emanating from that area.  When they reached Fox's cell, they observed him lying on his bed, motionless, with eyes rolled upward, and appearing purplish in color.  Fox was not breathing.  [Doc. 24 at 9-10].  Duarte called 911.  Inmate Ernest Griffin, with the assistance of inmate Joseph Carpenter, was attempting to revive Fox by applying pressure to Fox's abdominal area.  [See id. at 10 (explaining that officers in Fox's cell saw Griffin pushing up on Fox's lower stomach or belly); see also, e.g., Doc. 25;  Exh. H (Shawn Burrow stating that he saw Griffin "pushing up on Mr. Fox's  stomach, below the navel"); Exh. I (Mandy Queener stating that "Inmate Griffin was pumping up on Mr. Fox's belly"). When Griffin pushed on Fox's abdominal area, officers saw a clear, foamy liquid spew from Fox's mouth.  [Doc. 24 at 10].  It is undisputed that upon receiving an emergency call from

the RCDC at 11:41 a.m., 911 dispatched an ambulance, which arrived on-scene at 11:46 a.m. [See Doc. 30 at 9, ¶ 11; Doc. 25; Exhs. F-2, G-1, G-2, L-1].  Defendant Queener was sent to meet the ambulance crew, and it is undisputed that she "immediately and quickly escorted the four emergency medical personnel back to Dayroom 2."  [Doc. 24 at 12].

While awaiting the ambulance, which was coming from approximately one mile away, [see Doc. 25; Exh. L-1, "10/24/01 Portales EMS Service Report" (noting beginning mileage of 6663.0 and at-scene mileage of 6664.0)], Duarte ordered all inmates, including Griffin and Carpenter, locked in their cells, pursuant to the RCDC policy on inmate deaths, which provides that "[i]f a death occurs within the [RCDC], personnel *shall* immediately . . . preserve the scene[,]" and also mandates that [t]he staff person discovering a death *shall* immediately secure the area[.]"  [Id.; Exh. G-3 (emphasis added)].  RCDC policy also states that "[t]he body will not be removed but all inmates in the area will be moved to an area where they cannot see the body."  [Id.].  It is unclear, however, from the record evidence before the Court whether Fox was dead at the time Duarte cleared the area in accordance with the RCDC policy on inmate deaths.[4]  Shawn Burrow, in an Incident Report he completed shortly after Fox was pronounced dead, stated that Fox "had a very faint pulse if any[.]"  [Doc. 25; Exh. H-1].  In his sworn affidavit, however, Burrow clarified that "[t]he statement in [his] report ('he [Mr. Fox] had a very faint pulse if any') was based on

---

[4]  According to Duarte, she ordered the inmates locked in their cells not just in an effort to comply with RCDC policy on preserving the scene in the event of an inmate death, but also to allow the paramedics adequate space to treat Fox and "for security reasons (i.e., the needles, scalpels, etc. which would arrive with the paramedics) . . . ."  [Doc. 25; Exh. G at 3].

[Burrow's] subsequent recollection of what [Burrow] thought [he] overheard during the yelling and commotion and [Burrow has] no personal knowledge of whether Mr. Fox in fact had a pulse." [Id.; Exh. H at 2]. In any event, Defendants did not try to resuscitate Fox pending the arrival of the paramedics, although Duarte, Montoya, and Ramsey each attempted—unsuccessfully—to locate a pulse on Fox's body. While it is undisputed that Queener met the paramedics upon the their arrival at the RCDC and escorted them back to Dayroom 2 "immediately and quickly," the Court cannot at this stage of the proceedings say as a matter of law whether any delay on the part of Defendants present in Fox's cell at the time of this incident—Duarte, Queener, Montoya, Ramsey, and Burrow[5]—in providing medical care did or did not cause or contribute to Fox's death, such that it may be said that such delay did or did not amount to an Eighth Amendment violation. See Sealock, 218 F.3d at 1210 ("Delay in medical care only constitutes an Eighth Amendment violation where the plaintiff can show that the delay resulted in substantial harm.").

In light of this determination, the Court, pursuant to Fed.R.Civ.P. 56(f), will allow *limited* discovery, with respect to Defendants Annette Duarte, Tino Montoya, Victor Ramsey, Shawn Burrow, and Mandy Queener, on the following:

> *As to all actions on October 24, 2001 that took place from the time Duarte, Montoya, and Queener heard commotion and yelling from Dayroom 2, where Fox's cell was located, until the*

---

[5] Because there is no allegation that Defendant Belcher was present at the time of the alleged delay in the provision of medical care and, instead, the allegations against her center around her response to Fox's alleged complaints of chest pain, the Court concludes that Belcher is entitled to summary judgment with respect to any allegation that she exhibited deliberate indifference to Fox's medical needs by delaying the provision of medical care.

> *conclusion of the paramedics' resuscitation efforts; and*

> *As to whether Fox was alive or dead at the moment that Griffin and Carpenter were ordered to stop their resuscitation efforts.*

### E. Supervisory Liability

In addition to the individual Defendants discussed above, the Estate also has named Don Burdine, Director of the RCDC, and C.D. Newberry, Jr., Sheriff of Roosevelt County, as Defendants in this action.  [See Doc. 1 at 3].  The Court can discern from the pleadings no allegations against Burdine and Newberry other than those made against them in their supervisory capacities.  [See Doc. 1 at 3 (alleging that Burdine, as Director of the RCDC, "was responsible for the operation, maintenance, and safety of the [RCDC] at the time of the incarceration of the deceased up until and including the time of the death of the deceased[,]" and similarly alleging that Newberry, as Sheriff of Roosevelt County, "[was] responsible for the operation of the RCDC.")].  To the extent that they have been sued in their supervisory capacities, summary judgment will be entered in favor of Burdine and Newberry.  Summary judgment is appropriate under the circumstances because there is no vicarious liability under 42 U.S.C. § 1983.  Beedle v. Wilson, 422 F.3d 1059, 1073 (10th Cir. 2005) ("[T]here is no concept of strict supervisor liability under section 1983."); see also Smith, 2006 WL 1067305, at *2 (in Eighth Amendment prison-assault action, noting district court's denial of claims against most defendants on the ground that they were not involved in alleged assault incidents and there is no vicarious liability under § 1983).

**F. Municipal Liability**

Finally, in addition to all the individual Defendants discussed above, the Estate has named the RCDC and the County of Roosevelt as Defendants.  In certain situations, a plaintiff may sue a local governmental entity under 42 U.S.C. § 1983.  See  Monell v. Dep't of Soc. Servs., 436 U.S. 690 n.55 (1978).  In New Mexico, however, an organization such as a detention center is not a local governmental entity distinct from the county itself.  See NMSA 1978 § 4-38-1 (county constitutes "body politic and corporate"); see also Angel v. Torrance County Sheriff's Dep't, et al., No. CIV 04-195 BB/WPL (Memo.Op. and Order entered Aug. 23, 2005) at 7 (explaining that, under New Mexico law, sheriff's department is not local governmental entity distinct from county itself).  With respect to Defendant Roosevelt County, New Mexico law mandates that all suits or proceedings against a county be brought against the board of county commissioners.  NMSA 1978 § 4-46-1 ("In all suits or proceedings by or against a county, the name in which the county shall sue or be sued shall be the board of county commissioners of the county of _____[.]").  Accordingly, the Court concludes that the RCDC and Roosevelt County are not proper parties to this action. Even if they were, summary judgment would still be appropriate on the ground that the Estate has presented no evidence to justify the imposition of municipal liability.

While municipalities can be sued for monetary, declaratory, or injunctive relief for deprivations of constitutional or civil rights, a municipality will not be held liable for the actions of its employees under a theory of *respondeat superior*.  Monell, 436 U.S. at 690-691. Instead, a plaintiff seeking to impose liability on a municipality under § 1983 must

identify a municipal "policy" or "custom" causing the complained-of injury.  Marshall v. Columbia Lea Reg'l Hosp., 345 F.3d 1157, 1177 (10th Cir. 2003); see also Myers v. Oklahoma County Bd. of County Comm'rs, 151 F.3d 1313, 1318 (10th Cir. 1998) (explaining that a plaintiff suing a county under § 1983 for the actions of one of its officers must demonstrate *both* that (1) a municipal employee committed a constitutional violation *and* (2) a municipal policy or custom was the moving force behind the constitutional deprivation.) An unconstitutional deprivation is caused by a municipal "policy" if it results from decisions of a duly constituted legislative body or an official whose acts may fairly be said to be those of the municipality itself.   "Custom" has come to mean an act that, although not formally approved by an appropriate decision maker, has such widespread practice as to have the force of law.  Bd. of County Comm'rs v. Brown, 520 U.S. 397, 403, 404 (1997).  In the instant action, there is no allegation, much less evidence, that the harm that befell Fox resulted from a municipal custom or policy.  Consequently, even if the RCDC and Roosevelt County were properly named parties, they still would be entitled to summary judgment for lack of proof that the harm in this case resulted from a municipal custom or policy.

## III. CONCLUSION

A cognizable Eighth Amendment claim for denial of medical care lies where the acts or omissions of prison officials are sufficiently harmful to evidence a deliberate indifference to an inmate's serious medical needs.  To show "deliberate indifference," the plaintiff must show both that the deprivation at issue was "sufficiently serious" (the objective component) and that prison officials knew that the inmate faced a substantial risk of harm and disregarded

that risk by failing to take reasonable measures to abate it.  For the reasons expressed above, the Court concludes that, with respect to Fox's alleged complaints of chest pain, the Estate has failed to show that Defendants knew that Fox faced a substantial risk of harm and disregarded that risk by failing to take reasonable measures to abate it.  As such, the Estate has failed to satisfy the first element necessary to overcome Defendants' claim to qualified immunity, *i.e.*, that Defendants violated a constitutional or statutory right.  For that reason, summary judgment on the basis of qualified immunity will be entered for the individual Defendants with respect to the Estate's claim that they were deliberately indifferent to Fox's chest pain.

Summary judgment similarly is appropriate as to Defendants Burdine and Newberry, sued in their supervisory capacities, and as to the RCDC and Roosevelt County because they are not properly named parties.  Alternatively, summary judgment is proper as to the RCDC and Roosevelt County for lack of evidence that a municipal custom or policy caused the alleged harm.

Finally, pursuant to Fed.R.Civ.P. 56(f), the Court will defer ruling on Defendants' summary-judgment motion as to the Estate's allegation that Defendants Duarte, Montoya, Ramsey, Burrow, and Queener exhibited deliberate indifference to Fox's medical needs by failing to cause or allow CPR or other form of resuscitation to be administered to Fox in a timely manner n October 24, 2001.  The Court will permit limited discovery as described above.

**IT IS, THEREFORE, ORDERED** that Defendants' *Motion for Summary Judgment*

20

*(Qualified Immunity)* [Doc. 24] is **GRANTED IN PART** and **DEFERRED IN PART;**

    **IT IS FURTHER ORDERED** that Defendants' *Motion for Summary Judgment (Qualified Immunity)* is **GRANTED** as to Defendants Constance Belcher, Don Burdine, C.J. Newberry, Jr., Roosevelt County Detention Center, and Roosevelt County;

    **IT IS FURTHER ORDERED** that Defendants' *Motion for Summary Judgment (Qualified Immunity)* is **GRANTED IN PART** as to Defendants Annette Duarte, Tino Montoya, Victor Ramsey, Shawn Burrow, and Mandy Queener with respect to whether they were deliberately indifferent to Otis Owen Fox's complaints of chest pain;

    **IT IS FURTHER ORDERED** that, pursuant to Fed.R.Civ.P. 56(f), Defendants' *Motion for Summary Judgment (Qualified Immunity)* is **DEFERRED** as to Defendants Annette Duarte, Tino Montoya, Victor Ramsey, Shawn Burrow, and Mandy Queener with respect to whether they exhibited deliberate indifference to Otis Owen Fox's serious medical needs by delaying the provision of medical care on October 24, 2001;

    **IT IS FURTHER ORDERED** that, pursuant to Fed.R.Civ.P. 56(f), limited discovery is permitted with respect to Defendants Annette Duarte, Tino Montoya, Victor Ramsey, Shawn Burrow, and Mandy Queener as follows:

> As to all actions on October 24, 2001 that took place from the time Duarte, Montoya, and Queener heard commotion and yelling from Dayroom 2, where Fox's cell was located, until the conclusion of the paramedics' resuscitation efforts; and

> As to whether Fox was alive or dead at the moment that Griffin and Carpenter were ordered to stop their resuscitation efforts.

**IT IS FURTHER ORDERED** that the limited discovery permitted herein be completed on or before May 26, 2006;

**IT IS FURTHER ORDERED** that the parties have until June 9, 2006 to supplement Defendants' *Motion for Summary Judgment (Qualified Immunity)* and Plaintiff's Response.

**SO ORDERED** this 28th day of April, 2006, in Albuquerque, New Mexico.

_____
**M. CHRISTINA ARMIJO**
United States District Judge