## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**ESTATE OF OTIS OWEN FOX, et al.**,

        Plaintiffs,

vs.                                                    No. CIV 04-1214 MCA/WDS

**DON BURDINE, et al.,**

        Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court *sua sponte* following the Court's limited disposition of Defendants' *Motion for Summary Judgment (Qualified Immunity)* [Doc. 24], filed November 18, 2005, and the Court's directive to the parties to supplement the record after conducting additional discovery pursuant to Fed.R.Civ.P. 56(f); on Defendants' *Motion to Dismiss Claims Against Three Putative Defendants* [Doc. 40], filed June 5, 2006; on *Defendant Victor Ramsey's Alternative Motion for Summary Judgment* [Doc. 42], filed June 6, 2006; and on *Motion by Defendants to Strike Part of Supplemental Statement [Doc. 43]* [Doc. 47], filed June 21, 2006.  Having considered the parties' submissions, the relevant law, and otherwise being fully advised in the premises, the Court now grants Defendants' *Motion for Summary Judgment (Qualified Immunity)* in its entirety as to those parts of the motion on which the Court originally had deferred a ruling; grants Defendants' *Motion to Dismiss Claims Against Three Putative Defendants*; and grants *Motion by Defendants to Strike Part of Supplemental Statement [Doc. 43]*.  *Defendant Victor Ramsey's Alternative*

*Motion for Summary Judgment* is denied as untimely filed.

## I. BACKGROUND

The bulk of the factual background giving rise to this action is set out in the Court's *Memorandum Opinion and Order* of April 28, 2006 [Doc. 36] and need not be fully repeated here.[1]  For purposes of the instant disposition, it should be noted that on July 14, 2001, Otis Owen Fox was arrested for driving while intoxicated and subsequently booked into the Roosevelt County Detention Center ("RCDC").  [Doc. 24 at 4].  As of October 24, 2001, Fox was still a pretrial detainee at the RCDC.  On that date, on-duty personnel at the RCDC included Don Burdine, Director of the RCDC; Annette Duarte, RCDC Corrections Officer; Transport Officer Victor Ramsey;[2] RCDC Sergeant Tino Montoya and RCDC Detention Officers Shawn Burrow and Mandy Queener.  [Id. at 7].  Annette Duarte was the officer in charge.  [Id.].

---

[1]  In its April 28, 2006 *Memorandum Opinion and Order*, the Court entered summary judgment in favor of Defendants Constance Belcher; Don Burdine; C.J. Newberry, Jr.; Roosevelt County Detention Center; and Roosevelt County.  The Court allowed limited further discovery as follows:

*As to all actions on October 24, 2001 that took place from the time [Annette] Duarte, [Tino] Montoya, and [Mandy] Queener heard commotion and yelling from Dayroom 2, where [Otis Owen] Fox's cell was located, until the conclusion of the paramedics' resuscitation efforts; and*

*As to whether Fox was alive or dead at the moment that [inmates Ernest] Griffin and [Joseph] Carpenter were ordered to stop their resuscitation efforts.*

[2]  At all relevant times, Victor Ramsey was employed by the Roosevelt County Sheriff's Department, not the RCDC.  [Doc. 25; Exh. K, Oct. 10, 2005 affidavit of Victor Ramsey at 1; Doc. 42 at 2-3].

At approximately 11:35 on the morning of October 24, 2001, Duarte entered the RCDC control room.  [Doc. 45; Exh. Q, May 25, 2006 depo. testimony of Annette Duarte at 33-35, 88].  She had been in the control room for a few minutes when she heard yelling coming from Dayroom 2, where Fox's cell, Cell 11, was located.  Duarte left the control room and started walking toward Dayroom 2, but began running when the yelling intensified.  According to Duarte, it took her about 20 or 25 seconds to get from the control room to Dayroom 2.  [Id. at 22].  When she reached Dayroom 2, Duarte heard an inmate yell, "We got a man down," and she headed to Fox's cell.  [Id. at 32].  By this point, Duarte had been joined by Mandy Queener, and together they were the first of a number of RCDC guards or employees or other personnel to enter Cell 11, which they did at about 11:40, "give or take a few seconds."  [Id. at 30].  Duarte testified that as soon as she entered Fox's cell, she radioed Don Burdine to call for an ambulance.  [Doc. 45; Exh. Q at 52, 54].  A "Portales EMS Service Report" of October 24, 2001shows that an ambulance was activated to the RCDC at 11:41 that morning.  [Doc. 25; Exh. L-1, "10/24/01 Portales EMS Service Report"].  The RCDC daily log for October 24, 2001 also reflects that an ambulance was called for Fox at 11:41.  [Doc. 46; Exh. F].

Upon entering Fox's cell, Duarte observed Fox on his bed, with inmates Ernest Griffin and Joseph Carpenter over him.  Duarte saw Griffin "pushing on [Fox's] stomach [while Carpenter] was rubbing his arm and wiping his mouth with a towel."  [Doc. 45; Exh. Q at 23].  Queener similarly testified that she observed "Ernest on top of [Fox] pumping on

his stomach, and Joseph Carpenter wiping his mouth." [Doc. 45; Exh. U, May 26, 2006 depo. testimony of Mandy Queener at 27]. Although Queener testified that at that time she did not know what the administration of CPR should look like, she nevertheless "would think that you would pump on someone's chest and not their belly." [Id. at 31]. Indeed, through his deposition, Griffin testified that he learned CPR "thirty something years ago" in classes he never completed. [Doc. 45; Exh. P, May 26, 2006 depo. testimony of Ernest Griffin at 15, 50]. He also testified that, while he believed that Fox was probably already dead by the time he attempted to administer CPR, he continued his efforts because of the slim chance that Fox might be revived. Notwithstanding Griffin's efforts at CPR, Fox failed to move or breathe. [Id. at 18].

In any event, Duarte ordered Griffin and Carpenter to stop what they were doing and had Queener return them and other gathered inmates to their cells. [Doc. 45; Exh. Q at 44-46]. After radioing for an ambulance, which she sent Queener to meet, Duarte checked for a pulse on Fox. [Id. at 50]. She testified that she did not know what was wrong with Fox, whether he had suffered a heart attack or succumbed to another medical condition, or if he had been assaulted by other inmates. [Id. at 100]. Queener did not know what had happened to Fox—whether he had had a stroke or embolism, been injured by someone else, or died from a drug overdose. [Doc. 45; Exh. U at 92]. Shawn Burrow, who had arrived in the area with Duarte and Queener but did not actually enter Fox's cell, similarly testified that he saw Fox lying on his bed but did not know what had happened to him. He additionally

testified that he observed Ernest Griffin over Fox with his hands, palms open, at Fox's waist, and that he also saw Joseph Carpenter, although he could not tell what Carpenter was doing. [Doc. 45; Exh. T, May 26, 2006 depo. testimony of Shawn Burrow at 33-34, 87, 97]

Around the time that Duarte, Queener, and Burrow arrived at Dayroom 2/Cell 11, Victor Ramsey and Tino Montoya also appeared. [Id. at 45]. Victor Ramsey testified that when he entered Fox's cell, Fox was unresponsive, appeared cold and blue, and had liquid coming from his mouth. [Doc. 45; Exh. R, May 25, 2006 depo. testimony of Victor Ramsey at 7]. Ramsey checked for a pulse, as did Montoya. Neither Ramsey nor Montoya could locate a pulse, and Ramsey further could not tell whether Fox was breathing. Because he could not find a pulse just by feel alone, Ramsey asked Duarte to bring him a stethoscope. [Id. at 7]. Like Duarte, Queener, and Burrow, Ramsey did not know what was wrong with Fox.[3] [Id. at 15] Rather, Ramsey testified that "[t]here could have been a million things different wrong with him." [Id. 64]. In Ramsey's opinion, it was possible that the very inmates claiming to have been helping Fox could have been the ones who put him in that situation.[4]

---

[3] Although he did not witness their actions, Ramsey, who after the events in question here became certified in CPR, testified that on the basis of what he had heard, what Griffin and Carpenter were doing to Fox was not CPR and, if anything, was making the situation worse. [Doc. 45; Exh. R at 15, 19].

[4] Ramsey testified as follows at his deposition:

> And not knowing Mr. Fox's situation, why he was there . . .
> Did the inmates put him there?
> Did they do something to injure him?

Tino Montoya testified that he had been in his office eating a sandwich when he saw Ramsey run down the hall.  He had finished passing out lunch trays at about 11:20 and had returned to his office, checked on his trustees, and sat down to eat.  He first became aware of the commotion in Dayroom 2 at about 11:30, when he heard over his radio Duarte call for an ambulance.  [Doc. 45; Exh. S, May 25, 2006 depo. testimony of Celestino Montoya at 20-21, 24, 28].  Montoya began running after Ramsey.  [Id. at 26-27].  When Montoya reached Cell 11, he too checked for a pulse on Fox.[5]  Like Duarte, Queener, Burrow, and Ramsey, Montoya also did not know what had happened to Fox.  He testified that "[s]omebody might have hit him or—but I couldn't see any blood either, or you never know what—or maybe he passed out or something, you know."  [Id. at 52].

An ambulance crew arrived at the RCDC at 11:46 a.m.  [Doc. 25; Exh. L-1, "10/24/01 Portales EMS Service Report"].  Once the inmates had been locked in their cells, Queener met the ambulance crew and immediately and quickly escorted them back to Dayroom 2.  The four-man paramedic crew found Fox lying on his bed as the officers had

---

> Were they in the process of injuring him when people came through the door?
> Were they saying that they were doing CPR to cover up what they were really doing?
> Who knows?

[Doc. 45; Exh. R at 32].

[5] Montoya testified that he learned how to take a pulse from having been in the hospital "lots of times" and also from movies.  [Doc. 45; Exh. S at 49].

found him.  The paramedics observed Fox to be pulseless, unconscious, not breathing, and unresponsive.  Fox also was cyanotic (bluish or purplish) in appearance and was in full cardiac arrest.  The paramedics used "full code" procedures, including CPR, in an unsuccessful attempt to revive Fox.  They continued their efforts until 12:20 p.m., at which point they discontinued "code," Fox's condition having never changed.  [Id. at 11-12].

Following his death, Fox's sisters, Cloreta Joyce Hawk and Maurcenia Cross, co-personal representatives of Fox's estate ("the Estate"), brought this 42 U.S.C. § 1983 action against various Defendants, contending that Defendants' intentional indifference to Fox's need for medical attention was the actual and proximate cause of his death.  More specifically, the Estate alleges that Defendants' decision to prevent Griffin and Carpenter from continuing to administer CPR without providing substitute CPR, and failure to seek immediate emergency assistance for Fox constituted a deliberate indifference to Fox's life, safety, and well-being, in violation of the Eighth and Fourteenth Amendments to the United States Constitution.[6]  [Doc. 1 at 2, 4].  Defendants counter that they are entitled to qualified immunity.  [See Doc. 24].  As explained, the Court partially disposed of the Estate's claims in its April 28, 2006 Memorandum Opinion and Order and allowed the parties to conduct limited discovery on the issues described above in footnote 1.

---

[6]  The Estate's claim that Defendants exhibited deliberate indifference to a serious medical need by failing to respond to Fox's "many" complaints of chest pain, [Doc. 1 at 2], was resolved against the Estate in the Court's April 28, 2006 Memorandum Opinion and Order.

## II. ANALYSIS

### *Motion to Dismiss Claims Against Three Putative Defendants* [Doc. 40]

As an initial matter, the Court notes that in its April 28, 2006 *Memorandum Opinion and Order*, the Court treated Shawn Burrow, Tino Montoya, and Mandy Queener as Defendants.  On June 5, 2006, counsel for Defendants filed a *Motion to Dismiss Claims Against Three Putative Defendants*, explaining that Burrow, Montoya, and Queener, who (1) are not named in the *Complaint*, (2) were not issued a summons, and (3) were not served with process in the matter, are not parties to this action.  [Doc. 40 at 2].  Counsel submits that the Estate's attorney, Mr. Rane, opposes the motion and, while Mr. Rane believes the motion might have merit, he has requested additional time to review it.  [Id. at 4].  As of June 29, 2006, there has been no response to the motion.  See D.N.M.LR-Civ.7.7 (providing that a response must be served within 14 calendar days of service of a motion).

In its April 28, 2006 *Memorandum Opinion and Order*, the Court stated that Montoya, Burrow, and Queener apparently had been sued as John and Jane Does.  The Court's determination was based, at least in part, on the *Affidavit of Shawn Burrow*, in which Burrow stated that he was named as a Defendant in this action.  [See Doc. 25; Exh. H, Oct. 28, 2005 affidavit of Shawn Burrow].  Putting aside the Burrow affidavit, the Court, having reviewed the docket in this case, notes that Burrow, Montoya, and Queener, whose identities were known to the Estate by, at the latest, August 26, 2005, the date the *Initial Pretrial Report* ("IPTR") was filed, were never substituted for Jane and John Does One to Ten in an

amended complaint.  This is what should have happened if Burrow, Montoya, and Queener were originally intended as unknown John and Jane Does and the Estate eventually learned their true identities.  See  Maclin v. Paulson, 627 F.2d 83, 87-88 (7th Cir. 1980).

Instead, Burrow, Montoya, and Queener were never named as parties and, as counsel for Defendants asserts, are actually identified as witnesses in the IPTR.  [Doc. 23 at 6].  There also is nothing on the docket to indicate that Burrow, Montoya, and Queener were ever issued a summons or served with the *Complaint*.  Nor did the Estate ever move to extend the time to serve Burrow, Montoya, and Queener.  [See generally Dkt. in No. Civ. 04-1214 MCA/WDS).  "When a plaintiff fails to serve a defendant within the 120-day period, the district court shall dismiss the action without prejudice or direct that service be effected within a specified time."  Ledbetter v. City of Topeka, Kan., 318 F.3d 1183, 1187 (10th Cir. 2003) (internal quotation marks omitted).  For these reasons, the Court concludes that Burrow, Montoya, and Queener were never intended to be named parties to this action.  Accordingly, Defendants' *Motion to Dismiss Claims Against Three Putative Defendants* will be granted.  The Court also takes this opportunity to clarify that the remaining Defendants in this action are Annette Duarte and Victor Ramsey.[7]

---

[7]  [See Doc. 36 at 21 (dismissing as Defendants Constance Belcher; Don Burdine; C.J. Newberry, Jr.; Roosevelt County Detention Center; and Roosevelt County)].

### *Motion for Summary Judgment (Qualified Immunity)* **[Doc. 24]**

### <u>Standard of Review — Summary Judgment</u>

Summary judgment under Fed.R.Civ.P. 56(c) "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading. . . ." Fed.R.Civ.P. 56(e). Rather, "the adverse party's response . . . must set forth specific facts showing that there is a genuine issue for trial." <u>Id.</u> Judgment is appropriate "as a matter of law" if the nonmoving party has failed to make an adequate showing on an essential element of its case, as to which it has the burden of proof at trial. <u>See</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986); <u>Lopez v. LeMaster</u>, 172 F.3d 756, 759 (10th Cir. 1999).

In order to warrant consideration by the Court, the factual materials accompanying a motion for summary judgment must be admissible or usable at trial (although they do not necessarily need to be presented in a form admissible at trial). <u>See</u> <u>Celotex</u>, 477 U.S. at 324. It is not the Court's role, however, to weigh the evidence, assess the credibility of witnesses, or make factual findings in ruling on a motion for summary judgment. Rather, the Court assumes the evidence of the non-moving party to be true, resolves all doubts against the moving party, construes all evidence in the light most favorable to the non-moving party,

and draws all reasonable inferences in the non-moving party's favor.  See Hunt v. Cromartie, 526 U.S. 541, 551-52 (1999).

## Qualified Immunity and the Individual Defendants

Analysis of a motion for summary judgment based on qualified immunity, however, proceeds somewhat differently from other summary-judgment analyses because of the purposes behind qualified immunity.  Olsen v. Layton Hills Mall, 312 F.3d 1304, 1311 (10th Cir. 2002).  Where, as here, § 1983 defendants raise the defense of qualified immunity on summary judgment, the burden shifts to the plaintiff to show that (1) the defendants violated a constitutional or statutory right; and (2) the constitutional or statutory right was clearly established when the alleged violation occurred.  Farmer v. Perrill, 288 F.3d 1254, 1259 (10th Cir.2002).  It is the task of the Court to ask whether, taken in the light most favorable to the party asserting the injury, the facts alleged show that the defendants' conduct violated a constitutional right.  Saucier v. Katz, 533 U.S. 194, 201 (2001).  If so, the Court next asks whether the right was clearly established at the time of the alleged conduct.  Id.  If the plaintiff does not satisfy either part of the two-pronged test, the defendants are entitled to qualified immunity.  Gross v. Pirtle, 245 F.3d 1151, 1156 (10th Cir.2001).  If, however, the plaintiff demonstrates the violation of a clearly established constitutional or statutory right, the burden shifts back to the defendants to prove that no genuine issues of material fact exist and that they are entitled to judgment as a matter of law. In the end, therefore, the defendants still bear the normal summary-judgment burden of showing that no material facts remain in

dispute that would defeat the qualified immunity defense.  <u>Olsen</u>, 312 F.3d at 1312.

## 42 U.S.C. § 1983

Section 1983 of Title 42 of the United States Code provides, in relevant part, that

> [e]very person who, under color of any statute, ordinance,
> regulation, custom, or usage, of any State or Territory or the
> District of Columbia, subjects, or causes to be subjected, any
> citizen of the United States or other person within the
> jurisdiction thereof to the deprivation of any rights, privileges,
> or immunities secured by the Constitution and laws, shall be
> liable to the party injured in an action at law, suit in equity, or
> other proper proceeding for redress.

42 U.S.C. § 1983.  Section 1983 is not an independent source of substantive rights; rather

it is a mechanism for enforcing federal rights conferred elsewhere.  <u>See</u> <u>Albright v. Oliver</u>,

510 U.S. 266, 271 (1994).  Accordingly, an analysis of a plaintiff's federal civil-rights claim

necessarily begins by identifying the specific constitutional right or rights allegedly

infringed.  <u>Graham v. Connor</u>, 490 U.S. 386, 393-94 (1989).

As is relevant here, the Estate contends that Defendants exhibited a "deliberate

indifference to the life, safety and well being" of Fox by (1) preventing Griffin and

Carpenter from continuing to administer CPR without providing a substitute form of CPR,

and (2) failing to seek immediate emergency assistance for Fox, both of which worked a

violation of Fox's rights under the Eighth and Fourteenth Amendments.  [Doc. 1 at 2, 4].

## The Eighth Amendment

A plaintiff states a cognizable Eighth Amendment claim for denial of medical

attention if he "allege[s] acts or omissions sufficiently harmful to evidence deliberate

indifference to serious medical needs." Olsen, 312 F.3d at 1315 (*quoting* Estelle v. Gamble, 429 U.S. 97, 106 (1976)).  The right to custodial medical care is clearly established.  Estelle, 429 U.S. at 104.  While pretrial detainees are protected under the Due Process Clause rather than the Eighth Amendment, the Tenth Circuit applies an analysis identical to that applied in Eighth Amendment cases brought pursuant to § 1983.  Olsen, 312 F.3d at 1315 (*quoting* Lopez v. LeMaster, 172 F.3d 756, 759 n.2 (10th Cir.1999)).  In this case, it is not contested that at the time of his death, Fox was a pretrial detainee.  [See Doc. 1 at 2; Doc. 24 at 1].

The test for constitutional liability—"deliberate indifference"—involves both objective and subjective components.  Mata v. Saiz, 427 F.3d 745, 751 (10th Cir. 2005).  To satisfy the *objective* component, the prisoner or, in this case, the § 1983 plaintiff, must produce objective evidence that the deprivation at issue was in fact "sufficiently serious." The Tenth Circuit has stated that a medical need is sufficiently serious if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.  Id. (internal quotations omitted).  Where, however, the necessity for treatment would not be obvious to a lay person, "the medical judgment of the physician, even if grossly negligent, is not subject to second-guessing in the guise of an Eighth Amendment claim." Id.  Additionally, a delay in medical care constitutes an Eighth Amendment violation only where the plaintiff can show that the delay resulted in substantial harm.  Sealock v. Colorado, 218 F.3d 1205, 1210 (10th Cir. 2000).

The *subjective* prong of the "deliberate indifference" test requires the plaintiff to present evidence of the prison official's culpable state of mind.  <u>Mata</u>, 427 F.3d at 751.  The subjective element is satisfied if "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  <u>Farmer v. Brennan</u>, 511 U.S. 825, 837 (1994).  To be sure, the "deliberate indifference" standard lies "somewhere between the poles of negligence at one end and purpose or knowledge at the other."  <u>Mata</u>, 427 F.3d at 752 (*quoting* <u>Farmer</u>, 511 U.S. at 836); <u>see also</u> <u>Smith v. Cummings</u>, 2006 WL 1067305, at *2 (10th Cir. Apr. 24, 2006) (in Eighth Amendment prison-assault action, equating deliberate indifference to recklessness).  To find deliberate indifference does not require a finding of express intent to harm, and the plaintiff need not show that a prison official acted or failed to act believing that harm actually would befall an inmate.  Rather, it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm.  <u>Mata</u>, 427 F.3d at 752.  Whether the prison official had the requisite knowledge of such a substantial risk is a fact question subject to demonstration in ways including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.  <u>Oxendine v. Kaplan</u>, 241 F.3d 1272, 1276 (10th Cir. 2001) (internal quotation omitted).

## The Objective Component of the "Deliberate Indifference" Test

The first step in the analysis of the objective component of the "deliberate indifference" test is to identify the harm claimed by the plaintiff. See Mata, 427 F.3d at 753. "Once the [plaintiff] selects the harm, however, the focus of the objective prong should be solely on whether that harm is sufficiently serious." Id. In the instant case, the *Complaint* alleges, in pertinent part, that

> 14. On or about October 24, 2001, OTIS OWEN FOX, while confined at the RCDC suffered a heart attack or heart condition. *He likely would have lived if CPR was administered promptly.* Two inmates at the RCDC knew CPR and offered to perform CPR. *The supervisors at the RCDC (including defendant DUARTE) told the inmates that they could not perform CPR but did not provide any substitute for the CPR. FOX died due to the failure to receive CPR.* The removal of available CPR without providing substitute CPR constituted deliberate indifference to the life, safety and well being of OTIS OWEN FOX.
>
> 15. *Defendants failed to immediately seek emergency assistance* for OTIS OWEN FOX and this deliberate indifference caused the death of OTIS OWEN FOX.

[Doc. 1 at 2-4 (emphasis added)]. In light of these allegations, particularly the emphasized sections, the Court identifies the claimed harm as Defendants' failure to cause or allow CPR to be administered to Fox in a timely manner; in other words, Defendants' delay in providing medical care to Fox. A delay in medical care (so long as the plaintiff shows that delay resulted in substantial harm) has been deemed sufficiently serious to satisfy the objective component of the "deliberate indifference" test. See Sealock, 218 F.3d at 1210 (pain and

suffering resulting from prison officials' delay in providing medical care amounted to condition sufficiently serious to meet objective element of "deliberate indifference" test). Assuming without deciding, however, that Defendants' alleged delay in causing or allowing CPR to be administered promptly caused substantial harm, *i.e.*, death, the Court nevertheless concludes, as explained below, that the Estate is unable to satisfy the subjective component of the test for deliberate indifference.

### The Subjective Component of the "Deliberate Indifference" Test

In order for the Estate to satisfy the subjective component of the "deliberate indifference" test, it must show that Defendants knew of and disregarded an excessive risk to inmate health or safety, meaning that Defendants must both have been aware of facts from which the inference could be drawn that a substantial risk of serious harm existed and they must also have drawn the inference. Mata, 427 F.3d at 751. The Estate must additionally establish that Defendants knew that Fox faced a substantial risk of harm and disregarded that risk by failing to take reasonable measures to abate it. See Hunt v. Uphoff, 199 F.3d 1220, 1224 (10th Cir. 1999).

The Court concludes that the Estate has not shown that Defendants exhibited a deliberate indifference to Fox's needs by delaying the provision of medical care. See Mata, 427 F.3d at 755 ("A prisoner may satisfy the subjective component by showing that defendants' delay in providing medical treatment caused either unnecessary pain or a worsening of [his] condition."). The record evidence reveals that, on October 24, 2001, the

16

day of Fox's death, Duarte and Queener were the first RCDC employees to reach Dayroom

2 in response to the noise and commotion emanating from that area.  When they reached

Fox's cell, they observed him lying on his bed, motionless, with eyes rolled upward, and

appearing purplish in color.  Fox was not breathing.  [Doc. 24 at 9-10].  Duarte testified that

as soon as she reached Fox's cell, which was "[a]round 11:40, give or take a few seconds[,]"

she radioed the control room and instructed that 911 be called.  It is undisputed that upon

receiving an emergency call from the RCDC at 11:41 a.m., 911 dispatched an ambulance,

which arrived on-scene at 11:46 a.m.[8]  [See Doc. 30 at 9, ¶ 11; Doc. 25; Exhs. F-2, G-1, G-2,

L-1].  Queener was sent to meet the ambulance crew, and it is undisputed that she

"immediately and quickly escorted the four emergency medical personnel back to Dayroom

2."  [Doc. 24 at 12].

    While awaiting the ambulance, which was coming from approximately one mile

away, [see Doc. 25; Exh. L-1, "10/24/01 Portales EMS Service Report" (noting beginning

mileage of 6663.0 and at-scene mileage of 6664.0)], Duarte ordered the inmates, including

Griffin and Carpenter, locked in their cells.  At the time she issued this order, Duarte did not

know if Fox was dead or alive.  [Doc. 45; Exh. Q at 64].  Her decision to lock the inmates

in their cells during a time that at least one RCDC employee described as one of stress and

---

    [8]  Although the report that Shawn Burrow completed immediately after the incident of
October 24, 2001 reflected that he first heard yelling at 11:55 and that the ambulance arrived at
12:12, he later acknowledged that he only estimated those times.  [Doc. 45; Exh. T at 66].
Burrow further testified that while it *felt* as if 17 minutes passed between the initial cries and the
arrival of the ambulance, he knows from radio logs "for a fact now" that there was not a 17-
minute lapse.  [Id. at 67, 71].

great emotional confusion,[9] was consistent with the RCDC policy on inmate deaths, which provides that "[i]f a death occurs within the [RCDC], personnel *shall* immediately . . . preserve the scene[,]" and also mandates that "[t]he staff person discovering a death *shall* immediately secure the area[.]" [Id.; Exh. G-3 (emphasis added)]. RCDC policy also states that "[t]he body will not be removed but all inmates in the area will be moved to an area where they cannot see the body." [Id.]. Duarte explained that she ordered the inmates locked in their cells not just in an effort to comply with RCDC policy on preserving the scene in the event of an inmate death, but also to allow the paramedics adequate space to treat Fox and "for security reasons (i.e., the needles, scalpels, etc. which would arrive with the paramedics) . . . ." [Doc. 25; Exh. G at 3].

Defendants do not dispute that they did not administer CPR pending the arrival of the paramedics. However, Defendants testified that at the time they reached Fox in his cell, they did not know what had happened to him. Duarte testified that she did not know whether Fox had suffered a heart attack, succumbed to another medical condition, or been assaulted by other inmates. [Doc. 45; Exh. Q at 100]. Burrow saw Fox lying on his bed, but did not know what had happened to him. [Doc. 45; Exh. T at 87]. Neither did Queener. [Doc. 45; Exh. U at 92, 94]. Ramsey, who opined that "[t]here could have been a million things different wrong with [Fox,]" [Doc. 45; Exh. R at 64], considered that the very inmates who claimed to be administering CPR might have been attempting to cover up the fact that they

---

[9] [See Doc. 45; Exh. T, May 26, 2006 depo. testimony of Shawn Burrow at 39].

had injured Fox.  Finally, Montoya suggested that "[s]omebody might have hit [Fox] . . . or you never know what—or maybe he passed out or something, you know."  [Doc. 45; Exh. S at 52].

Although the Estate contends that, upon reaching Fox's cell, "[D]efendants removed competent CPR," [Doc. 43 at 5], little in the record supports the conclusion that CPR was being administered competently here.  To the contrary, the testimony of the three RCDC employees (Duarte, Queener, and Burrow) to witness Griffin's attempt at revival establishes that Griffin was pushing on Fox's stomach or abdomen and had his hands at Fox's waist.  Even Griffin testified that  he learned CPR "thirty something years ago" in classes he never completed.  [Doc. 45; Exh. P at 15, 50].  Griffin himself acknowledged that, notwithstanding his attempt at CPR, Fox failed to breathe or move.  [Doc. 45; Exh. P at 18].

The Estate may not rely on mere allegations that Griffin was performing competent CPR at the time he was stopped; rather, it is the Estate's burden to come forward with specific facts showing that there is a genuine issue for trial.  Instead, the record evidence shows that immediately upon reaching Fox's cell, not knowing what had befallen him, Defendants called for an ambulance.  While awaiting the arrival of the ambulance, Defendants halted efforts at CPR that three RCDC employees described as being performed on Fox's stomach.  The ambulance arrived at the RCDC five minutes after it was called, and an RCDC employee, who had been waiting for the ambulance at the facility's sally port, quickly escorted the ambulance crew to Fox's cell.  Given these circumstances, the Court

cannot say that Defendants exhibited a deliberate indifference to Fox's medical needs.

### *Defendant Victor Ramsey's Alternative Motion for Summary Judgment* **[Doc. 42] and** *Motion by Defendants to Strike Part of Supplemental Statement [Doc. 43]* **[Doc. 47]**

On June 6, 2006, Defendant Ramsey filed *Defendant Victor Ramsey's Alternative Motion for Summary Judgment*, in which he argues that he was not deliberately indifferent to Fox's medical needs and that, as an employee of the Roosevelt County Sheriff's Department, *not* of the RCDC, he cannot be deemed Fox's custodian for purposes of the Eighth Amendment.  [Doc. 42 at 5-7].  The Estate has not responded to Ramsey's motion.

Rule 16(b) of the Federal Rules of Civil Procedure requires the Court to enter a scheduling order that limits the time to, among other things, file motions.  Fed.R.Civ.P. 16(b)(2).  Once entered, "[a] schedule shall not be modified except upon a showing of good cause and by leave of the district judge." Fed.R.Civ.P. 16(b).  Still, "a court choosing to modify the schedule upon a showing of good cause, may do so only 'if it cannot reasonably be met despite the diligence of the party seeking the extension.'" Leary v. Daeschner, 349 F.3d 888, 906 (6th Cir. 2003) (*quoting* Fed.R.Civ.P. 16, 1983 advisory committee's notes).

In this case, the Magistrate Judge issued an initial scheduling order requiring the parties to, *inter alia*, cooperate in preparing an IPTR.  [Doc. 14].  The IPTR, in turn, set February 3, 2006 as the date by which to file dispositive motions, expressly providing that "[a]ny pretrial motions, other than discovery motions, filed after the above date[] shall be considered untimely in the discretion of the Court."  [Doc. 23 at 11].  In its April 28, 2006 *Memorandum Opinion and Order*, this Court allowed limited additional discovery as to the

issues set forth above in footnote 1, and ordered the parties to supplement Defendants'

*Motion for Summary Judgment (Qualified Immunity)* and the Estate's response.  [Doc. 36

at 22].  The Court did not grant leave (nor was any such leave requested) to file additional

or alternative summary-judgment motions.   That Defendants' *Motion for Summary*

*Judgment (Qualified Immunity)* was filed November 18, 2005, well before the dispositive-

motion deadline of February 3, 2006, militates against a finding that, despite his diligent

efforts, Ramsey was unable to meet this deadline.  See Leary, 349 F.3d at 906 .  Accordingly,

*Defendant Victor Ramsey's Alternative Motion for Summary Judgment*, filed more than four

months after the dispositive-motion deadline, will be denied as untimely.

The final motion before the Court is the *Motion by Defendants to Strike Part of*

*Supplemental Statement [Doc. 43]*, in which Defendants seek to strike paragraph 20 of the

Estate's *Supplemental Statement Concerning Qualified Immunity Allegation of Defendants*.

[See generally Doc. 47].  In paragraph 20, counsel for the Estate represents that

> [t]here is an additional witness, Joseph Carpenter, an inmate at
> the time of the incident, who lives out of state and who the
> parties have agreed, pending Court approval, to allow him to
> provide a sworn statement for purposes of this proceeding.  It
> is respectfully maintained that his testimony will indicate that
> the time from the cry for "man down" til the arrival of EMS
> might well have approached thirty minutes.  This is consistent
> with the cries coming at 11:17, followed by a five minute delay
> in getting to Day Room 2, followed by nineteen minutes of
> delay in calling for EMS personnel.

[Doc. 43 at 5].  Defendants state that they have so far been—and are likely to continue to

be—unsuccessful in arranging for Carpenter's voluntary telephonic deposition.  Apparently

21

maintaining that paragraph 20 amounts to a representation by counsel for the Estate of Carpenter's expected testimony, Defendants move to strike on the ground that statements of counsel are not evidence.  [See Doc. 47 at 2].

As stated above, in order to warrant consideration by the Court, the factual materials accompanying a motion for summary judgment must be admissible or usable at trial.  See Celotex, 477 U.S. at 324.  Statements of counsel, however, are not summary-judgment evidence and will not create an evidentiary dispute.  Sorbo v. United Parcel Serv., 432 F.3d 1169, 1175 (10th Cir. 2005); see also Thomas v. Wichita Coca-Cola Bottling Co., 968 F.2d 1022, 1025 (10th Cir. 1992) ("[S]tatements of counsel are not summary judgment evidence.").  To the extent that paragraph 20 constitutes counsel's belief as to what Carpenter's testimony would reveal, it will be stricken.

## III. CONCLUSION

A cognizable Eighth Amendment claim for denial of medical care lies where the acts or omissions of prison officials are sufficiently harmful to evidence a deliberate indifference to an inmate's serious medical needs.  To show "deliberate indifference," the plaintiff must show both that the deprivation at issue was "sufficiently serious" (the objective component) and that prison officials knew that the inmate faced a substantial risk of harm and disregarded that risk by failing to take reasonable measures to abate it.  For the reasons expressed above, the Court concludes that, in this case, the Estate has failed to show that Defendants knew that Fox faced a substantial risk of harm and disregarded that risk by

22

failing to take reasonable measures to abate it.  As such, the Estate has failed to satisfy the first element necessary to overcome Defendants' claim to qualified immunity, *i.e.*, that Defendants violated a constitutional or statutory right.  For that reason, summary judgment on the basis of qualified immunity will be entered for the remaining Defendants, Annette Duarte and Victor Ramsey.  See Gross, 245 F.3d at 1156 (explaining that defendants entitled to qualified immunity if plaintiff does not satisfy either part of the two-pronged qualified immunity test).

**IT IS, THEREFORE, ORDERED** that Defendants' *Motion for Summary Judgment (Qualified Immunity)* [Doc. 24] is **GRANTED;**

**IT IS FURTHER ORDERED** that Defendants' *Motion to Dismiss Claims Against Three Putative Defendants* [Doc. 40] is **GRANTED**;

**IT IS FURTHER ORDERED** that *Defendant Victor Ramsey's Alternative Motion for Summary Judgment* [Doc. 42] is **DENIED**;

**IT IS FURTHER ORDERED** that the *Motion by Defendants to Strike Part of Supplemental Statement [Doc. 43]* [Doc. 47] is **GRANTED**;

**IT IS FURTHER ORDERED** that this action be and hereby is **DISMISSED WITH PREJUDICE**.

**SO ORDERED** this 30th day of June, 2006, in Albuquerque, New Mexico.

**M. CHRISTINA ARMIJO**
United States District Judge